IN THE UNITED STATES DISTRICT COURT

FOR THE EASTERN DISTRICT COURT OF CALIFORNIA

UNITED STATES OF AMERICA,

        Plaintiff,                     No. 2:12-CR-00239 KJM

   vs.

MICHAEL ADAM CRUZ,

        Defendant.                   <u>ORDER</u>

_____/

        This matter is before the court on defendant's motion to dismiss his criminal indictment for enticement of a minor. (ECF 19.) On June 12, 2013, the court held a hearing at which Assistant U.S. Attorney Kyle Reardon appeared for the United States ("government") and Assistant Federal Defender Timothy Zindel appeared for defendant Michael Cruz, who was present in custody. For the reasons below, the court DENIES defendant's motion.

I.       <u>ALLEGED FACTS AND PROCEDURAL BACKGROUND</u>

        Defendant is a clinically depressed twenty-two-year-old male who resides in Oroville, California. On June 28, 2012, he was indicted for violating 18 U.S.C. § 2422(b), enticement of a minor. (Indictment, ECF 7.) The indictment is based on a series of internet and telephone communications and an attempted in-person meeting between defendant and

1

"Amy," the internet moniker of a Sacramento County Sheriff's Department Detective named James Williams disguised virtually as a thirteen-year-old girl on the internet.

On May 9, 2012, defendant posted[1] an advertisement on Craigslist in which he sought a "bdsm relationship"[2] with someone that "must be over 18 (duh) but look younger." (Government's Opp'n, ECF 25 at 32.) Williams, under the guise of "Amy," responded to this ad on May 10, 2012: "saw ur post and I love the thot of bdsm[;] question is do u really mean 18 ;) or is a little younger ok." (*Id.*) Defendant responded eight hours later asking "Amy" how much younger than eighteen she was. (*Id.*) When Amy did not reply, defendant sent a second inquiry via his personal email on May 17, asking "[h]ow much younger are we talking so I can figure out what you wanted to do?" (*Id.* at 34.) By May 19, Amy still had not responded, and defendant sent a third inquiry that stated simply: "Hello?" (*Id.*) When Amy finally responded on May 29, via email and Craigslist, indicating she is only thirteen, defendant did not cease conversing with her. Instead, defendant wrote back seven minutes later, "you know it's usually a sex thing, right?" Amy responded "uh huh that's wats fun :)." (*Id.* at 35.) That same day, defendant's roommate accessed defendant's email and messaged Amy: "Please do not contact me again. You are too young. I'm looking for legal age." (*Id.*) A few minutes later, Williams responded as Amy: "whateverrrrrrrrrrrrrrrrrrrrrrrrrrrr[;] ok i dont kno what got into u but im sure i can find better." (*Id.* at 36.) An hour later, defendant replied, "Sorry someone got my account," to which Amy replied, "ohhhhhh k didnt seem like it was something ud say." (*Id.*)

Over the next two weeks, defendant continued communicating with Amy, largely via text messaging.[3] The texts reveal that defendant wanted to meet with Amy in person, but since she "lived" in Sacramento and he was in Oroville without a car, arranging a meeting was difficult. Amy stated she had a friend, also a thirteen-year-old, who lived in

---

[1] In his papers, defendant impliedly concedes he posted the Craigslist ad. (*See* Reply, ECF 29 at 4 ("Mr. Cruz's Craigslist posting expressly sought an adult sexual relationship . . . .").)

[2] BDSM stands for bondage-discipline, dominance-submission, and sadism-masochism.

[3] On one occasion, after defendant repeatedly attempted to speak with Amy on the phone, Williams had a female law enforcement officer call defendant while posing as Amy.

2

Oroville; she could go to Oroville to see defendant under the guise of visiting this friend. Defendant began trying to convince Amy to "share" him with her friend and to permit him to meet her friend before Amy was able to reach Oroville: "Is it bad that your sexy daddy is so wanting that he can't wait?" (*Id.* at 64.) Defendant also disclosed that he was in an open marriage and that he had a daughter; a few days later, he told Amy that he was separating from his wife. His wife also called Amy several times and left her a voice message, in which she stated: "Hi this is Ashley Cruz I'm married to Michael Cruz also known as Cole Cobalt. I was just wondering if you knew about me and if you could please contact me at the soonest availability. Thank you. Bye." (*Id.* at 54 (reproduced without punctuation as in the original transcript).)

Finally, on June 12, 2012, Amy told defendant she was driving to Oroville with her grandmother. Defendant said he would "go get a few things" and that if he could not get them he "promise[d] [she] won't get preggers." (*Id.* at 83.) They arranged to meet at Arby's, where defendant was arrested. He had no condoms or other items associated with sex on his person.

Detective Scott Schofield drove defendant to the Sacramento County Jail from Oroville. Along the way, Schofield engaged defendant in conversation about the circumstances leading to his arrest. For nearly an hour, Schofield utilized various interrogation techniques, such as sympathizing with defendant about his plight and frustrated sexual desire, minimizing the seriousness of sexual contact with minors, and instructing defendant he would fare better before a judge if he confessed to having nefarious rather than innocent intentions in meeting Amy. Eventually, defendant admitted he intended to have sex with Amy and possibly her friend.

II. <u>ANALYSIS</u>

Under Federal Rule of Criminal Procedure 12(b), a party "may raise by pretrial motion any defense, objection, or request that the court can determine without a trial of the general issue." In the instant motion, defendant urges the court to dismiss the indictment against him on three primary grounds: the unconstitutionality of 18 U.S.C. § 2422(b),

entrapment, and outrageous government conduct in violation of due process. The court addresses each argument in turn and concludes each lacks merit.

### A. Constitutionality of 18 U.S.C. § 2422(b)

Section 2422(b) provides:

> Whoever, using the mail or any facility or means of interstate or foreign commerce, or within the special maritime and territorial jurisdiction of the United States knowingly persuades, induces, entices, or coerces any individual who has not attained the age of 18 years, to engage in prostitution or any sexual activity for which any person can be charged with a criminal offense, or attempts to do so, shall be fined under this title and imprisoned not less than 10 years or for life.

18 U.S.C. § 2422(b).

Defendant argues this statute is unconstitutional facially and as applied because it exceeds Congress's power to regulate non-economic intrastate activity under the Commerce Clause. (Reply, ECF 29.) Defendant's argument draws heavily on the Supreme Court's Commerce Clause taxonomy developed in *United States v. Lopez*, 514 U.S. 549, 558 (1995), in which the Court "identified three broad categories of activity that Congress may regulate under its commerce power[:]"

> First, Congress may regulate the use of the channels of interstate commerce. Second, Congress is empowered to regulate and protect the instrumentalities of interstate commerce, or persons or things in interstate commerce, even though the threat may come only from intrastate activities. Finally, Congress' commerce authority includes the power to regulate those activities having a substantial relation to interstate commerce, i.e., those activities that substantially affect interstate commerce.

*Id.* at 558–59 (citations omitted).

Defendant contends section 2422(b) is not a valid enactment under any of the three *Lopez* categories. (ECF 29 at 9–13.) Defendant argues that Congress does not have plenary power to make any law that concerns the use of the telephone or the internet regardless of the tenuousness of the connection between the regulated conduct and these channels of interstate commerce. (ECF 23 at 18.) He says that section 2422(b) does not regulate the use of the channels of interstate commerce (category one) because it is intended to protect minors, not

4

commerce. (*Id.* at 9–10.) Defendant asserts that the cases the *Lopez* Court cited as representative of this first category involved intrastate conduct that harmed interstate commerce. In *United States v. Darby*, 312 U.S. 100, 115 (1941), the Court upheld the Fair Labor Standards Act because "interstate commerce should not be made the instrument of competition in the distribution of goods produced under substandard labor conditions, which is injurious to the commerce and to the states from and to which the commerce flows." And in *Heart of Atlanta Motel, Inc. v. United States*, 379 U.S. 241, 258 (1964), the Court upheld the prohibition on discrimination in public accommodations contained in the Civil Rights Act of 1964 because the evidence demonstrated discriminatory hotel policies significantly harmed commerce among the states by impeding travel.

Neither does section 2422(b) fit into *Lopez*'s second category, defendant argues. The cases representative of this category demonstrate that Congress's "power to regulate and protect the instrumentalities of commerce is a power to prevent *threats* to those instrumentalities, not to proscribe [sic] the manner in which those instrumentalities may be used." (ECF 29 at 11) (original emphasis). In the *Shreveport Rate Cases*, 234 U.S. 342, 350 (1914), the Court held the Interstate Commerce Commission could regulate intrastate rates the railroads charged because the railroad, an instrument of commerce, was being used in a discriminatory manner that injured interstate commerce. Similarly, in *S. R. R. Co. v. United States*, 222 U.S. 20, 22 (1911), the Court upheld federal penalties for a railroad's unsafe cars, used only intrastate, because of the obvious risk to interstate commerce posed by intrastate operation of defective cars on an interstate line.

Finally, defendant contends, and the government concedes, that section 2422(b) does not pass constitutional muster under *Lopez*'s third category. (ECF 29 at 12–13; ECF 25 at 12.) Those cases representative of this category involve the regulation of an intrastate activity that must, to be upheld, "substantially affect[] interstate commerce." *See Lopez*, 514 U.S. at 559, 561. Defendant asserts the "substantial effect" doctrine represents the outer limit of permissible Commerce Clause regulation; hence, this third category is the default category for a statute that does not fit into the first or second categories. (ECF 29 at 12–13.) Because section

2422(b) does not fit into the first two categories and does not substantially affect commerce, defendant concludes, it is unconstitutional. (*Id.* at 13.)

The government contends that criminalizing attempts to entice a minor to engage in prohibited sexual conduct through the internet and telephone is a valid exercise of the commerce power under *Lopez*'s first and second categories, which is enough to pass muster. (ECF 25 at 17–18 (citing *United States v. Tykarsky*, 446 F.3d 458, 470 (3rd Cir. 2006); *United States v. Hornaday*, 392 F.3d 1306, 1310 (11th Cir. 2004)).) The Ninth Circuit has held that both the internet and the telephone are instrumentalities of interstate commerce. *United States v. Tello*, 600 F.3d 1161, 1165 (9th Cir. 2010); *United States v. Nader*, 542 F.3d 713, 717 (9th Cir. 2008). The government argues section 2422(b) requires "using the mail or any facility or means of interstate or foreign commerce" and is therefore constitutional because Congress has plenary power to regulate the channels and instrumentalities of interstate commerce. (ECF 25 at 10 (quoting *Heart of Atlanta*, 379 U.S. at 256).)

The court finds section 2422(b) is a valid Commerce Clause enactment under *Lopez*'s first category. In *Heart of Atlanta*, the Supreme Court stated that "the authority of Congress to keep the channels of interstate commerce free from immoral and injurious uses has been frequently sustained, and is no longer open to question." 379 U.S. at 241. The Court noted that this authority is not contingent upon the regulated conduct being commercial or economic in nature. *Id.* It is this authority that the Court later described as *Lopez*'s first category. *See* 514 U.S. at 558 ("Congress may regulate the use of the channels of interstate commerce.").

The Ninth Circuit has held that the internet is both a channel and an instrumentality of interstate commerce, *United States v. Sutcliffe*, 505 F.3d 944, 953 (9th Cir. 2007), and that the telephone is both a channel, *United States v. Holder*, 302 F. Supp. 296, 298 (D. Mont. 1969), *aff'd and adopted*, 427 F.2d 715 (9th Cir.1970) (per curiam), and an instrumentality, *Nader*, 542 F.3d at 717, of interstate commerce. Section 2422(b) prohibits the use of the "mail or any facility or means of interstate or foreign commerce" in the enticement of a minor. The court interprets the statute's text, "means of interstate commerce," to include

within its meaning "channels" of interstate commerce. *See Gibbs v. Babbitt*, 214 F.3d 483, 490–91 (4th Cir. 2000) (citation and internal quotations omitted) ("The term 'channel of interstate commerce' refers to, *inter alia,* . . . interstate telephone and telegraph lines; air traffic routes; television and radio broadcast frequencies.")  Therefore, because the charging statute regulates the use channels of interstate commerce, it is a facially valid exercise of Congress's Commerce Clause power.  And because defendant is charged with enticing a minor *through* use of the internet and the telephone, both of which are channels of interstate commerce, the statute is also constitutional as applied.  *See* pages 9–10 *infra*.

    This court's conclusion is consistent with the decisions reached by the circuit courts that have considered the question.  In *Tykarsky*, the Third Circuit affirmed the validity of section 2422(b), reasoning the statute regulates instrumentalities and channels of commerce, in that case the internet.  446 F.3d at 470.  The Eleventh Circuit in *Hornaday* concluded likewise, elaborating that "Congress clearly has the power to regulate the internet . . . and to prohibit its use for harmful or immoral purposes regardless of whether those purposes would have a primarily intrastate impact."  392 F.3d at 1311 (citing *Heart of Atlanta Motel*, 379 U.S. at 256).

    Defendant correctly notes that the *Heart of Atlanta Motel* and *Darby* cases, cited by the *Lopez* court as representative of category one, both upheld statutes that targeted economic conduct found to be injurious to interstate commerce.  *See Heart of Atlanta Motel*, 379 U.S. at 252–58 (upholding the regulation of public accommodation in part because of the "burdens that discrimination by race or color places upon interstate commerce"); *United States v. Darby*, 312 U.S. 100, 118 (1941) (upholding the Fair Labor Standards Act in part because Congress's power extends to "those activities intrastate which so affect interstate commerce . . . .").  In fact, the Court's reasoning in these two cases is similar to the "substantial effects" test the Court described in *Lopez,* as well as in *United States v. Morrison*, 529 U.S. 598 (2000), and which has become the hallmark of *Lopez*'s third category.  Employing the substantial effects test, the Court invalidated a statute that prohibited gun possession in a school zone, *Lopez*, 514 U.S. at 549, and a statute that provided a civil remedy for the victims of gender-motivated violence, *Morrison*, 529 U.S. at 598.  These statutes were struck down in part

because they lacked a jurisdictional element, which would have required the government to prove a nexus with interstate commerce in each case. *Morrison*, 514 U.S. at 613 (noting both statutes lacked jurisdictional elements, which "lend support to the argument that [a statute] is sufficiently tied to interstate commerce").

         Defendant argues that section 2422(b) is a non-economic statute more similar to those at issue in *Lopez* and *Morrison,* aside from the addition of a jurisdictional element, than to the economic statutes at issue in *Heart of Atlanta Motel* and *Darby*. Put differently, section 2422(b) is a statute that reaches the intrastate – in the instant case -- non-economic conduct of enticing a minor, which is similar to the intrastate non-economic actions of gun possession and gender-motivated violence, except that section 2422(b) contains the jurisdictional element "using the mail or any facility or means of interstate or foreign commerce" that was fatally absent in *Lopez* and *Morrison*. The court understands defendant's argument to amount to a contention that section 2422(b)'s jurisdictional element, "standing alone," does not "serve to shield a statute from constitutional infirmities under the Commerce Clause." *United States v. Alderman*, 565 F.3d 641, 648 (9th Cir. 2009). "At most, the Supreme Court has noted such an element '*may* establish that the enactment'" is constitutional. *Id.* (quoting *Morrison*, 529 U.S. at 612–13; emphasis in original; internal quotations and citation omitted). Accordingly, defendant asserts that the government additionally must prove that the non-economic, intrastate criminal enticement of a minor has a sufficiently close nexus to interstate commerce to warrant regulation under the Commerce Clause. *See Morrison*, 529 U.S. at 611 ("In a sense any conduct in this interdependent world of ours has an ultimate commercial origin or consequence, but we have not yet said the commerce power may reach so far." (quoting *Lopez*, 514 U.S. at 580 (Kennedy, J., concurring))); *see also Jones v. United States*, 529 U.S. 848, 850, 857 (2000) (interpreting a federal statute prohibiting arson of "property used in interstate [] commerce or in any activity affecting interstate [] commerce" not to apply to owner-occupied private residences to avoid "grave and doubtful constitutional questions").[4]

---

[4] When the regulated conduct is noneconomic and criminal in nature, the Court's jurisprudence strongly suggests that a federal statute faces a very high bar. *See id.* at 610 ("Even *Wickard* [*v.*

Having carefully considered the question, the court finds that section 2422(b) is a quintessential category one case, more similar to *Heart of Atlanta Motel* and *Darby* than to *Lopez*. The fact that *Heart of Atlanta Motel* and *Darby* involve economic activities is one reason defendant's argument misconstrues the essence of *Lopez*'s first category: that Congress, in regulating the use of a channel of commerce, is *per se* regulating conduct that has an adequate nexus to interstate commerce.[5] In *Heart of Atlanta Motel*, the targeted discriminatory conduct occurred through denying public accommodation to persons using the interstate highway system, analogous to, in this case, using the internet system. In *Darby*, the targeted harmful employer conduct occurred when products made under substandard labor conditions were shipped in interstate commerce, analogous to, in this case, when the text messages were sent. By comparison, in *Lopez*, mere possession of a gun in a school zone, without any connection to a channel of interstate commerce, unlike in this case, was unconstitutional.

The instant case provides a stronger example of a category one case than either *Heart of Atlanta Motel* or *Darby,* because there is a closer temporal nexus between the regulated conduct and the use of the channel of commerce. The discrimination in *Heart of Atlanta Motel* suffered by minority travelers occurred after a person traveled on the interstate highways. The substandard labor practices in the factories in *Darby* occurred before any products were shipped in interstate commerce. So regarded, the category one inquiry in these two cases appears to collapse into category three. *See Scarborough v. United States*, 431 U.S. 563, 571–75 (1977) (upholding conviction under felony possession of a firearm statute—

---

*Filburn*, 317 U.S. 111 (1942)], which is perhaps the most far reaching example of Commerce Clause authority over intrastate activity, involved economic activity in a way that the possession of a gun in a school zone does not."); *cf. Rice v. Santa Fe Elevator Corp.*, 331 U.S. 218, 230 (1947) ("Congress legislated here in field [sic] which the States have traditionally occupied. So we start with the assumption that the historic police powers of the States were not to be superseded by the Federal Act unless that was the clear and manifest purpose of Congress." (citations omitted)).

[5] Another reason defendant misapprehends the essence of category one is that the Court in *Heart of Atlanta* and *Darby* found that the regulated conduct was injurious to interstate commerce. Protecting interstate commerce is a hallmark of category two, however.

requiring proof only that the gun *at some point* was in interstate commerce—because Congress intended to regulate matters affecting commerce, not just to regulate commerce itself). But the Ninth Circuit has noted that the *Lopez* categories "have never been deemed exclusive or mandatory"; they are a "guide, not a straitjacket." *Alderman*, 565 F.3d at 646 (citation and internal quotation marks omitted).

The plain language of section 2422(b), as applied to the facts in this case, regulates only conduct that occurs through the use of a channel of interstate commerce. The alleged persuasion, inducement, enticement, or coercion transpired through the use of the internet and the telephone. Therefore, the temporal nexus between the regulated conduct of enticement and the use of the channels of commerce, the internet and the telephone, is very strong: they occurred simultaneously. Section 2422(b) is a valid Commerce Clause enactment that fits comfortably in *Lopez*'s first category. Defendant's constitutional challenge is denied.

B. Entrapment

"To establish entrapment as a matter of law, the defendant must point to undisputed evidence making it patently clear that an otherwise innocent person was induced to commit the illegal act by trickery, persuasion, or fraud of a government agent." *United States v. Williams*, 547 F.3d 1187, 1197 (9th Cir. 2008) (quotations and citation omitted). "This is a subjective inquiry into whether the Government's deception actually implants the criminal design in the mind of the defendant." *Id.* (internal quotations and citation omitted). "Inducement can be any government conduct creating a substantial risk that an otherwise law-abiding citizen would commit an offense, including persuasion, fraudulent representations, threats, coercive tactics, harassment, promises of reward, or pleas based on need, sympathy or friendship." *Id.* (quotations and citation omitted).

/////
/////
/////
/////

A defendant must also be predisposed to commit the crime. *Id.* at 1198. The Ninth Circuit considers five factors to determine whether a defendant was predisposed:

> (1) the character or reputation of the defendant, including any prior criminal record; (2) whether the government initially made the suggestion of criminal activity; (3) whether the defendant engaged in the criminal activity for profit; (4) whether the defendant evidenced reluctance to commit the offense that was overcome by repeated government inducement or persuasion; and (5) the nature of the inducement or persuasion supplied by the government.

*Id.* "The defendant's reluctance to engage in criminal activity is the most important." *Id.* (quotations and citation omitted). "[P]redisposition is to be determined prior to the time the government agent suggested the criminal activity." *Id.*

Defendant argues the government's conduct in this case constitutes entrapment as a matter of law. Defendant asserts that Detective James Williams, who posed as a thirteen-year-old girl on the internet, induced defendant to solicit sex from a minor by implanting that very idea. (ECF 20 at 28–32.) When Williams contacted defendant, defendant's Craigslist ad explicitly sought a relationship with someone over eighteen. Furthermore, at the time Williams suggested that defendant consider sexual contact with a minor, there was no evidence defendant was predisposed to have sex with minors. (*Id.* at 32–34.)

The government counters that it is premature to argue entrapment, which is a factual defense generally decided by the jury, not the court. (ECF 25 at 19 (citing *United States v. Smith*, 866 F.2d 1092, 1095 n.5 (9th Cir. 1989)).) The government also argues that defendant was the first to suggest criminal activity: when Williams responded to defendant's Craigslist ad by informing defendant that "Amy" might be a minor, defendant did not end the relationship, but rather responded "hOw [sic] much younger are we talking." (*Id.* at 21.) Additionally, defendant was predisposed to commit this crime because he repeatedly communicated with someone that he knew was only thirteen years old, with the intent of engaging that minor in a BDSM relationship. (*Id.*)

The court concludes it is indeed premature to rule on defendant's entrapment arguments at this time. To prevail on his entrapment defense, defendant must show both inducement and predisposition. *United States v. Poehlman*, 217 F.3d 692, 697 (9th Cir. 2000). On the current record, the court cannot conclude there is "undisputed evidence making it patently clear" that Williams induced defendant to commit the crime. *Williams*, 547 F.3d at 1197.

To violate section 2422(b), a defendant has to "knowingly persuade[], induce[], entice[], or coerce[]" a minor to engage in "any sexual activity for which any person can be charged with a criminal offense, or attempt[] to do so." 18 U.S.C. § 2422(b). Defendant posted the initial ad on Cragislist seeking a "bdsm relationship" with someone that "must be over 18 (duh) but look younger." (ECF 25 at 32.) Williams, under the guise of "Amy," responded to this ad on May 10, 2012: "saw ur post and I love the thot of bdsm[;] question is do u really mean 18 ;) or is a little younger ok." (*Id.*) Defendant responded eight hours later asking "Amy" how much younger than eighteen she was. (*Id.*) Amy did not reply, and defendant sent a second inquiry via email on May 17, asking "[h]ow much younger are we talking so I can figure out what you wanted to do?" (*Id.* at 34.) By May 19, Amy still had not responded, and defendant sent a one-word email: "Hello?" (*Id.*) When Amy finally responded on May 29, via email and Craigslist, saying she is only thirteen, defendant did not stop communicating with her, but instead wrote back seven minutes later "you know it's usually a sex thing, right?" Amy responded "uh huh that's wats fun :)." (*Id.* at 35.) On this record, a reasonable trier of fact could conclude that defendant, not Williams, initiated attempts to persuade "Amy" to engage in sexual activity by first posting the solicitation with language conceivably communicating he preferred a minor, "but look younger," and by continuing to pursue Amy even after he learned she was a minor.

C. Outrageous Government Conduct (Due Process)

If in the course of obtaining an indictment the government acts so outrageously that it is shocking to due process values then the indictment must be dismissed. *United States v. Montoya*, 45 F.3d 1286, 1300 (9th Cir. 1995). This "extremely high standard" requires an

indictment be dismissed only when the government's conduct is "so grossly shocking and outrageous as to violate the universal sense of justice." *Id.* (citation and internal quotation marks omitted). This standard is met when "undercover agents or informers engineer and direct the criminal enterprise from start to finish." *United States v. Mitchell*, 915 F.2d 521, 525-26 (9th Cir. 1990); *see also Williams*, 547 F.3d at 1199 (quoting *United States v. Gurolla*, 333 F.3d 944, 950 (9th Cir. 2003)). Outrageous government conduct is not a question of fact for the jury, but a question of law for the court. *United States v. Citro*, 842 F.2d 1149, 1152 (9th Cir. 1988).

Defendant asserts two instances of outrageous government behavior in this case. First, "the indictment rests entirely on coercion by Williams designed to assure an already-completed, prosecutable crime." (ECF 25 at 36.) In this endeavor Williams exploited defendant's need for an emotional connection as well as his mental illness, severe depression. (*Id.*) Second, Schofield lied to defendant on the drive to Sacramento by minimizing the seriousness of having sex with minors and by misrepresenting what a judge would think about defendant's case, which, because Schofield had read the texts in this case, amounted to eliciting a false confession.

The government correctly notes that courts have long countenanced law enforcement practices similar to those defendant challenges here. *See, e.g., Mitchell*, 915 F.2d at 526 (finding that Postal Service's use of unsolicited mailings to those with a possible interest in child pornography was not outrageous government conduct). Defendant cites no factually analogous case to support his argument and the court cannot locate one either. As the Ninth Circuit has noted, "many people in our society may find the deceptive use of sex in law enforcement to be morally offensive." *United States v. Simpson*, 813 F.2d 1462, 1468 (9th Cir. 1987). "Nonetheless, in order to apprehend those engaged in serious crime, government agents may lawfully use methods that are neither appealing nor moral if judged by abstract norms of decency." *Id.* (citation and internal quotation marks omitted). Schofield's interrogation tactics also were not sufficiently outrageous, assuming without deciding that defendant's accusations

13

are true. *See Miranda v. Arizona*, 384 U.S. 436, 453 (1966) (including trickery among permissible police interrogation techniques).

III. CONCLUSION

    For the foregoing reasons, defendant's motion is DENIED.

    IT IS SO ORDERED.

DATED: July 23, 2013.

                                      UNITED STATES DISTRICT JUDGE